## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| In re Joseph A. Buralli,<br>　　　　　Debtor. | Bankruptcy No. 10-B-74494 |
| Charles Cameron,<br>　　　　　Plaintiff<br>v.<br>Joseph A. Buralli,<br>　　　　　Defendant | Adversary No. 10-A-96183<br>Chapter 7<br>Judge Thomas M. Lynch |

### MEMORANDUM DECISION

The Debtor, Joseph A. Buralli, has been a real estate developer since 1988. Charles Cameron, plaintiff herein, is a self-employed computer consultant who invested in or financed several of Buralli's real estate development projects after the two became friends. Ultimately, the real estate market crashed, the projects fell through, and Buralli owed Cameron more than $5,000,000. Cameron sued his former friend in state court and eventually obtained a judgment in the amount of $5,316,442. Buralli then filed this Chapter 7 bankruptcy case.

The matter before the court arises out of the adversary complaint brought by Charles Cameron to determine under 11 U.S.C. §§ 523(a)(2)(A) and (B) and 523(a)(4) the dischargeability of judgment debt entered against the Debtor in the Circuit Court of Cook County, Illinois. Cameron alleges that the Debtor made material misrepresentations to him about Buralli's ownership of certain land at the time the Plaintiff agreed to lend him money or extend the terms of his loans. The court held a two-day evidentiary hearing at which it heard the testimony of the Debtor, the Plaintiff, the Plaintiff's wife, Robert Stone and Paul Duggan and received exhibits into evidence. The Plaintiff and Debtor both filed post-hearing briefs and

the court has considered the evidence presented at trial and the arguments made in the briefs and in open court, and makes the findings of fact and conclusions of law set forth below in accordance with Bankruptcy Rule 7052.

In reaching this decision, the court reviewed the parties pleadings and filings in this adversary proceeding, including the Answer to Complaint and the parties' respective Pre-Trial Conference Memoranda, and considered the evidence and argument presented by the parties at trial and in written post hearing submissions, including the following exhibits which were admitted with no objection:

(1)     Buralli facsimile re "Buralli Loans and Extensions," October 31, 2003 (Pl. Ex. 3)

(2)     Personal Financial Statements of Buralli, 2003, 2005, 2007, 2008 (Pl. Exs. 7 – 10)

(3)     Summary of Loans from Cameron to Buralli (Pl. Ex. 13)

(4)     Buralli Promissory Note to Cameron dated 6/27/2008 (Pl. Ex. 14)

(5)     Buralli Promissory Note to Cameron dated 6/26/2009 (Pl. Ex. 15)

(6)     Memorandum of Judgment in favor of Cameron and against Buralli entered by the Circuit Court of Cook County, Illinois and dated July 9, 2009 (Pl. Ex. 16)

(7)     Bankruptcy Schedules filed in In re Joseph A. Buralli, case no. 10 BK 74494, on October 20, 2010 (Pl. Ex. 17)

(8)     Pistakee Partners Financial Statements for 2000, 2001, 2002, 2003 and 2004, 2005, 2006, 2007, 2008, 2009, 2010 (Def. Ex. 1 – 10)

(9)     Pistakee Partners U.S. partnership tax return and schedules for 2008, 2009 (Def. Exs. 11, 12)

(10)    Standard Land Sale Contract for 196 acres in Huntley, Illinois (Def. Ex. 17).

The evidence considered also includes the testimony at trial by plaintiff Charles Cameron, Maller Solai, defendant Joseph Buralli, Robert Stone, and Paul Duggan. The parties stipulate as to the amount owed by Defendant to Plaintiff. (ECF Nos. 58, 59).

## I.      JURISDICTION

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. A proceeding to determine the dischargeability of a particular debt arises in a case under title 11 and is a core proceeding under 28 U.S.C. § 157(b)(2)(I). *Sullivan v. Glenn (In re Glenn)*, 502 B.R. 515 (Bankr. N.D. Ill. 2013). Therefore, this court has authority to enter final judgment.

## II.     FACTS

The plaintiff, Charles Cameron first met Mr. Buralli in 2001 when Mr. Cameron bought from Mr. Buralli, Buralli's partners to be precise, a 48 acres of real property in Lakemore, Illinois and an additional 35 acres land nearby. These transactions went smoothly and Mr. Cameron testified that the two men became friends. Mr. Buralli would socialize with Mr. Cameron and his wife, such as to celebrate birthdays and children's graduations. At one such get-together at the Debtor's home in the spring of 2003, Mr. Buralli spoke to Mr. Cameron and his spouse, Mallar Solai, about a waterpark project that he hoped to invest in located near Huntley, Illinois, "Sun Island" and a related condominium development. Buralli mentioned that he was looking for investors to develop a condominium building and waterpark with his two partners and asked Cameron to loan him funds to invest in the waterpark project. Mr. Cameron was initially interested in purchasing one of the proposed condo units, but then became interested in

investing in the project as a whole after Mr. Buralli asked if he would lend him some money for

the project.

　　While Mr. Cameron was contemplating the proposed investment in early April, Mr.

Buralli gave Mr. Cameron a personal financial statement dated March 31, 2003, listing total

assets of $11,067,416 and total liabilities of $600,000 (a single mortgage on his home).  The

statement listed his individual property, including his residence and cash on one page, but the

largest asset was his net interest in land investments of $9,027,086, which was described in

more detail on a separate attachment.  This breakdown listed 13 separate properties, the date

each was acquired, acreage, total value, debt encumbering each property, and Mr. Buralli's

percentage interest in each of the lands.  For all of the properties he had a percentage interest

of 50% or less.  The Huntley property was described as two separate parcels, acquired in 1997,

totaling 140 acres, with a total value of $25,445,635 and encumbered by $13,500,000 in debt,

owned 33.33% by Mr. Buralli.  Therefore the breakdown reflected Mr. Buralli as having a net

interest of $3,981,839 in the Huntley property.  Although the attachment did not specify

precisely how each property was owned, Mr. Cameron's wife asked Mr. Buralli about the

Huntley property and Mr. Cameron therefore knew that it was owned by a limited liability

company. (Trial Tr. 52:19–21, Jan. 30, 2014.)  When asked, Mr. Buralli told him that the limited

liability company was owned by Buralli, Bob Racic and Paul Duggan.

　　Mr. Buralli took Mr. Cameron and his wife to see the Huntley property in early April

2003. That was Mr. Cameron's sole investigation of the property and the other information

provided on the financial statement.  He never asked Mr. Buralli about the debt listed as

encumbering the Huntley land and never asked to see any loan documents. (Trial Tr. 53:13–15,

Jan. 30, 2014.) He never asked about or made any independent inquiry about the value of the

land or the title or any of the other properties listed on the statement. (Trial Tr. 53:16–18, Jan.

30, 2014.) He did not ask to see the organizational documents or financial records of the

limited liability company that owned the land. (Trial Tr. 53:10–12, 19–24, Jan. 30, 2014.)

Before Mr. Cameron lent Mr. Buralli any money, however, Mr. Buralli came to Mr.

Cameron in April or May 2003 with a plan to build a different waterpark development in

Harvard, Illinois, on property then owned by Motorola. Mr. Buralli indicated that the Harvard

project was a better opportunity. They decided that, rather than proceed with the Huntley

project, Mr. Buralli would place the Huntley land for sale. On May 16, 2003, Mr. Cameron lent

Mr. Buralli $900,000 for the Harvard project, and in June 2003 Mr. Buralli paid a $1 million

nonrefundable down payment on a contract to purchase the Harvard land from Motorola. The

testimony was unclear whether Mr. Buralli paid this amount individually or through a corporate

entity, but at some point Mr. Buralli formed an Illinois limited liability company, Waterpark

H2Otels USA, LLC to ultimately purchase the land. Between September 2003 and July 2004, Mr.

Cameron lent Mr. Buralli an additional $3,461,428.85 for the Harvard project in 27 separate

advances.[1] (Ex. 13.)

As additional consideration for the loans, Mr. Buralli gave Mr. Cameron a percentage

interest in Waterpark H2Otels USA, LLC with each advance. Mr. Cameron's interest in the LLC

was apparently 25% as of September 2, 2003, but increased to 44% by June 2004. Mr. Cameron

testified that he understood that the loans would be repaid either when the LLC obtained

---

[1] The testimony was vague about the initial terms of the loans. Included in the received exhibits were copies of
promissory notes in connection with 5 of the 27 advances. Each of these notes provided for 5% interest per
annum. For three, the note provided that principal and interest was due in December 2004. In the other two, the
parties apparently misunderstood the form document they were using and put the date funds were advanced in
the blank for the due date.

financing from a third party lender or when the property[2] was sold. By July 2004 the parties

realized that they would not be able to find third party financing. Between July and September

2004 Motorola indicated that it would not give any further extensions on the contract to

purchase, meaning that the Harvard project was no longer viable.

    At some point, Mr. Cameron and Mr. Buralli were involved in another project to buy and

develop land in Hoffman Estates. Mr. Cameron was a "50 percent partner" in the Hoffman

Estates project. (Trial Tr. 50:23–25, Feb. 27, 2014.) In February 2005 Mr. Buralli gave Mr.

Cameron an updated financial statement for Mr. Cameron to take to certain banks that Mr.

Cameron had relationships with in order to seek financing for the Hoffman Estates project. The

2005 financial statement stated that Mr. Buralli had total assets of $16,258,267 and total

liabilities of $4,877,309, and stated his liability to Mr. Cameron as $3,550,305. The interest in

the Huntley property was listed on a separate page for "other assets," including the other

investment real estate. Mr. Buralli's interest was described as "Regency Square – Huntley, IL

(Pistakee Partners, LLC)," and his two year "projected cash to Buralli" was listed as $2,486,151.

A footnote that is largely illegible states that the property was being marketed for sale. (Pl.'s Ex.

8). Mr. Cameron testified that he understood the reference to Regency Square and to Pistakee

Partners to refer to the Huntley real estate, and did not seem to have been surprised that the

2005 statement described the land as being owned by a limited liability company rather than by

Mr. Buralli individually.

    In May 2007, while discussing the repayment of Mr. Buralli's outstanding debt to Mr.

Cameron, Mr. Cameron's wife "wanted to know which properties [Mr. Buralli] was selling and

---

[2] The testimony was not clear whether Mr. Cameron was referring to the Harvard property or the Huntley property
on this point. (Trial Tr. 56:2–7, Jan. 30, 2014.)

what was his current financial condition," so Mr. Cameron asked Mr. Buralli for an updated financial statement. (Trial Tr. 57:1–11, Feb. 27, 2014.) Mr. Cameron provided him with another financial statement, dated as of May 31, 2007. The 2007 financial statement stated that Mr. Buralli had total assets of $11,981,027 and total liabilities of $3,937,988, but incorrectly stated his liability to Mr. Cameron as only $2,378,488. (Pl.'s Ex. 9.) Like the 2005 financial statement, the 2007 statement described the Huntley property under "Name of Property (Owner)" as "Regency Square, Huntley, IL (Pistakee Partners, LLC)," but in other details was more like the 2003 statement, listing date, acreage, value, debt, net equity, percentage ownership and net interest. It listed Mr. Buralli's net interest in the Huntley property as $3,884,812. However, in an additional column for "Description of Asset Owned by Buralli," he described his interest in the Huntley property as "Membership Interest in Pistakee Partners, LLC, an Illinois limited liability corporation that owns the subject real estate." Further, while Mr. Cameron testified that he had asked for the financial statement because he was "worried about collecting [his] money from Mr. Buralli" at the time, he also admitted that he did not ask for any other information or investigate further because they "were in the middle of trying to do the Hoffman Estates project [and] we knew what was going on with his investment and our investment and the state of his affairs." (Trial Tr. 63:10–24, 64:10–13, Jan. 30, 2014.) Although Mr. Cameron alleged that he read and relied on the financial statement, he admitted that he did not notice that his loan balance was incorrectly stated. (Trial Tr. 62:21 – 63:3, Jan. 30, 2014.)

On or about June 27, 2008, Mr. Buralli signed a promissory note in favor of Mr. Cameron consolidating his existing indebtedness to Mr. Cameron of $4,653,176. 52, with an extended maturity date of June 27, 2009 and a new interest rate of 7% *per annum*. (Pl.'s Ex. 14.) On or

about June 26, 2009, Mr. Buralli signed a new consolidated note in favor of Mr. Cameron for $4,968,637.65 with an extended maturity date of June 27, 2010. (Pl.'s Ex. 15.) In connection with this loan extension, Mr. Buralli gave Mr. Cameron an updated financial statement dated as of December 31, 2008. (Pl.'s Ex. 10.) The description and valuations of the Huntley property were substantially the same as in the 2007 statement. The 2008 statement listed Mr. Buralli's debt to Mr. Cameron as $4,173,173. After Mr. Buralli failed to repay the note in 2010, Mr. Cameron sued him on the note in state court. He obtained a judgment of $5,316,442.00 on June 28, 2010. (Pl. Ex.16).

Mr. Buralli filed his voluntary petition for protection under Chapter 11 of the Bankruptcy Code on September 8, 2010. The Debtor voluntarily converted the case to Chapter 7 on October 20, 2010. A Chapter 7 trustee determined there were no assets to administer for the estate, and a discharge was entered and the bankruptcy case closed on April 30, 2013.

Mr. Cameron contends that in the course of discovery in his state court lawsuit in 2010 he for the first time learned that Mr. Buralli did not own an equity interest in the Huntley property's owner, Pistakee Partners, LLC. The Huntley property was purchased in 1998 by Huntley Investment, LLC, an entity owned by Mr. Buralli 33-1/3% with his two partners, Paul Duggan and Bob Racic. In 2000 or 2001, at the suggestion of Mr. Duggan, Huntley Investment, LLC transferred the Huntley property to Pistakee Partners, LLC, an entity owned by Mr. Buralli's, Mr. Duggan's and Mr. Racic's wives, in exchange for a $10 million note in favor of Huntley Investment, LLC with 6 or 7 percent *per annum* interest. Mr. Buralli testified that he believed this was done solely for tax purposes, and that he was not entirely aware of the nature of the transaction. (Trial Tr. 22:12–23, Feb. 27, 2014.)

In addition to the written financial statements, Mr. Cameron testified that on several

occasions Mr. Buralli referred to himself as "owning" the Huntley property or referred to

himself as owning an interest in Pistakee Partners, LLC. For example, in 2003 in discussions

with Mr. Cameron and his wife Mr. Buralli referred to himself several times as "owning" the

property with two partners. Mr. Cameron also testified that in 2003 his wife asked Mr. Buralli

in what form he owned the Huntley property and that Mr. Buralli told them that it was owned

by an LLC owned by himself, Mr. Duggan and Mr. Racic. (Trial Tr. 52:19 – 53:11, Jan. 30, 2014.)

He also made promises to sell the land several times in 2008 and 2009, at least implying that he

owned or controlled the land. (Trial Tr. 95:13–23, Jan. 30, 2014.)

### III.    ANALYSIS

Mr. Cameron brings this action under provisions of the Bankruptcy that provide

for exceptions to the general discharge under Chapter 7 when the debtor has been less

than honest. The Plaintiff contends that Mr. Buralli's debt stems from his false

misrepresentations as to his interest in the Huntley property and that the debt is non-

dischargeable under three separate provisions of Sections 523 of the Code, namely

Sections (a)(2)(A) and (B) and Section 523(a)(4). (Cmplaint., ECF No.1). Specifically, this

adversary proceeding is based on the claim that the Debtor falsely represented to Mr.

Cameron that Mr. Buralli owned an interest of the percentage membership of the

limited liability company that directly owned 140 acres of land in Huntley, Illinois, when

in fact the land was owned by another limited liability company that owed Mr. Buralli's

company money. Mr. Buralli made these representations both in writing, in four

personal financial statements, and orally, in a series of conversations between 2003 and

2009.

To further the primary purpose of providing the debtor a fresh start, "exceptions

to discharge are to be construed strictly against a creditor and liberally in favor of the

debtor." *In re* Crosswhite, 148 F.3d 879, 881 (7th Cir. 1998). The objecting creditor

bears the burden to prove the objection, *Goldberg Secs., Inc. v. Scarlata (In re Scarlata),*

979 F. 2d 521,524 (7th Cir. 1992), which burden must be satisfied by a preponderance of

the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### A.  Exception to Discharge Under Section 523(a)(2).

Section Section 523(a)(2) (A) of the Bankruptcy makes nondischargeable a debt:

> for money, property, services, or an extension, renewal, or refinancing of credit,
> to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a
>       statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2).

To prove a Section 523(a)(2)(A) claim based on misrepresentation, the plaintiff must

demonstrate "(1) that [Debtor] made a false representation or omission, which he either knew

was false or made with reckless disregard for the truth; (2) that [Debtor] possessed an intent to

deceive or defraud; and (3) that [Plaintiff] justifiably relied on the false representation." *Reeves*

*v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011).

Section 523(a)(2)(A) cannot be used to find an oral misrepresentation as to financial

condition nondischargeable. *See, e.g., Stelmokas v. Kodzius*, 460 Fed. Appx. 600 (7th Cir. Feb.

2., 2012) ("The debt is still dischargeable if the [oral] claim of false pretenses, false

representation, or actual fraud rests on 'a statement respecting the debtor's ... financial condition.'"); *Berkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 963-964 (7th Cir. 2004) (noting that "the subsections of § 523 should not be construed to make others superfluous" and agreeing that § 523(a)(6) cannot be used to circumvent § 523(a)(2)(B)'s writing requirement).

The Seventh Circuit has acknowledged without taking sides that there is a split in authority as to what constitutes a "statement respecting the debtor's financial condition." *Stelmokas*, 460 Fed. Appx. 600. Under the narrow view "the statement must paint a picture about the debtor's overall financial health, while the broad view encompasses statements of that nature along with any other that conveys significant information about the debtor's finances." *Id*. (citing *In re Joelson*, 427 F.3d at 705 (narrow view); *In re Bogdanovich*, 292 F.3d at 112 (noting inconsistent views but declining to choose); *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1061 (4th Cir.1984) (broad view)). But, this court need not decide whether the 'narrow view' or 'broad view' standard applies here because the statements that form the basis of Mr. Cameron's Section (a)(2)(A) claim are without question statements "respecting the Debtor's or insider's financial condition" and, therefore, fall outside this provision. 11 U.S.C.§523(a)(2)(A).

Mr. Cameron asserts that Mr. Buralli made the misrepresentations about the Huntley Property in writing, in four statements dated March 2003, February 2005, May 2007 and December 2008. (Exs. 7-10.) Each of these purport to list the Debtor's assets and liabilities, including what is variously described as the Debtor's "Land Holdings" or "Partial Interest In Real Estate Holdings." All four statements include an entry for the Huntley Property stating the net value (or "interest") to Mr. Buralli, or in one instance the projected cash flow for Mr. Buralli.

Each of these documents are captioned "Personal Financial Statement" and Mr. Cameron does not allege that these documents were given to and reviewed by him to for any purpose other than to assess Mr. Buralli's ability to repay loans.

Similarly, Mr. Cameron offers no evidence that the several oral representations alleged in the complaint about Mr. Buralli's interest in the Huntley property – during the initial discussion at the Debtor's Lakemore home in the Spring of 2003, in the course of the subsequent meeting at Cameron's office, when the parties went to see the Huntley property in April 2003, or during the fish fry with Mayor Sass of Huntley in July of that year – were anything but statements respecting the Debtor's financial condition. Indeed, when asked during cross examination whether "throughout all these conversations that you had with Mr. Buralli regarding his ownership in land and the deals he was doing and all those things, those were all in the context of his financial condition, correct?" Mr. Cameron answered unequivocally, "Yes." (Trial Tr., 1/30/15, 67.) Mr. Cameron has failed to show these representations were not respecting the Debtor's financial condition and, indeed, appears to acknowledge that the oral and written misrepresentations on which he relies fall squarely within the "safe harbor" term Congress expressly included in Section 523(a)(2)(A). Accordingly, judgment must be entered in favor of the Debtor on Count I.

The second count of Mr. Cameron's Complaint alleges the same set of facts to request that his state court judgment be excepted from discharge under Section 523(a)(2)(B). Subpart (B) provides for excepting from discharge any debt

> "for money, property…or an extension, renewal, or fefinancing of credit, to the extent obtained by
> > (B) use of a statement in writing—
> > > (i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such
money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to
deceive;

11 U.S.C. §523(a)(2)(B). Thus, to prove a Section 523(a)(2)(B) claim, the plaintiff must demonstrate "that the debtor made a materially false written statement about his financial condition with the intent to deceive, and that the creditor reasonably relied on the statement." *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen),* 507 F.3d 610, 613 (7th Cir. 2007). As with subsection (A), the plaintiff here "bears the burden to demonstrate by a preponderance of the evidence that the exception applies." *Id.*

"[R]ecklessly making a false representation can satisfy the intent to deceive requirement of § 523(a)(2)(B)." *In re Hudgens,* 149 Fed. Appx. 480 (7th Cir. Aug. 26, 2005) (citing *In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995)). For both subsections of Section 523(a)(2), the false representation or omission must be "materially false" to support the claim. *Heptacore, Inc. v. Luster (In re Luster),* 50 Fed. Appx. 781 (7th Cir. Nov. 1, 2002). *See Field v. Mans,* 516 U.S. 59, 68 (1995) ("common sense would balk" at negative implication that a representation under subsection (A) need not be material). However, the exception to discharge provided by subsection (B) applies only to written misrepresentations and requires a showing of "reasonable reliance." *Field v. Mans,* 516 U.S. at 74-75).

For purposes of this relief, Mr. Cameron may rely only on the four written statements, Mr. Buralli's "Personal Financial Statements," that are alleged. Section 523(a)(2)(B). "The requirement of a writing is a basic precondition to nondischargeability under section 523(a)(2)(B)." 4 Collier on Bankruptcy §523.08[2][b] at 523-48 (16th ed. 2010).

The Plaintiff has sufficiently established that at least three of these Personal Financial Statements are not only false, but are materially false with respect to their representations regarding the Huntley property. These writings, one of which is a Small Business Administration form and three of which were ostensibly used in connection with an attempt to obtain a bank loan are sufficient to "determine financial responsibility." *Old Kent Bank-Chi. V. Price (In re Price)*, 123 B.R. 43, 45 (Bankr. N.D. Ill. 1991). That they are false is not controverted; indeed, Buralli's own written Closing Argument that he submitted after trial acknowledges that "Buralli made a false representation of fact. Specifically, he did not own the Huntley Land nor did he have an ownership interest in Pistakee Partners." (Buralli Closing Argument, ECF No. 71 at 6.)

Nevertheless, in his "Personal Financial Statement 31-MAR-03," for example, Mr. Buralli includes among his assets "Land Holds" which include the Hundley Property. (Ex. 7.) That schedule indicates without qualification a "% Owned" and "Net Interest" that form part of the Land Holds referenced as his assets.   In fact, he admits that well before the date of his financial statement his limited liability company, Huntley Partners, had transferred its ownership interest in the Huntley Property to Pistakee Partners LLC in return for which his group allegedly received a promissory note for $4 million – an instrument neither he nor his partners have been able to locate. Mr. Buralli's signed 2007 Personal Financial Statement indicates that his assets include his "Net Equity-Partial Interests in Real Estate" and then attaches an exhibit, entitled "Joseph A. Buralli Partial Interest Real Estate Holdings As Of [unclear].../07. (Ex. 9.) The exhibit includes an entry for the Huntley property, naming Pistakee Partners as the owner and then stating as for Buralli with regard to this property, among other things:   "Net Equity...$11,685,000...% Owned by Buralli...33%...Value of Buralli Interest...$3,884,612."   All

would appear materially misleading even without the "Explanation of Asset Owned by Buralli"

that he includes in this schedule which falsely states that he holds a "[m]embership interest in

Pistakee Partners, LLC, an Illinois limited liability corporation that owns the subject real estate."

(Id.)  Similar false statements about the Huntley property are found in the Debtor's 2008

Personal Financial Statement (Ex. 10.)[3]

        This court finds that these statements objectively misrepresent information of the type

that would normally affect the particular type of decision at issue here, namely, Mr. Cameron's

decision to provide Mr. Buralli several personal loans over the course of nearly fifteen months

for $4,361,428.85 in total, and to subsequently extend the payment date for these loans.  As

such, these writings are objectively material and thereby satisfy the second element for

establishing a claim under Section 523(a)(2)(B). Collier §523.08[2][b].

        The preponderance of the evidence also establishes Buralli's deceitful intent, the fifth

element of a claim under subsection (a)(2)(B). It is uncontroverted that the Debtor caused these

documents to be given to Mr. Cameron.  While the Debtor concedes that he directly provided

only the 2003 statement in connection with the loans, contending that the subsequent

statements were prepared for the purpose of Mr. Cameron providing the statements to other

lenders, the evidence is more than sufficient to establish Buralli's responsibility for making and

publishing them. Further, the evidence establishes that the Debtor either knowingly made

---

[3] The materiality of the remaining financial statement is not so evident. His unsigned 2005 "Personal Financial Statement" was presumably used in connection with a one year extension through 2006 refers not to the values but to an expected cash flow beginning in 2008.  It discloses his interest in the Huntley property to be "Net Equity-Other Asset" that it explains is a "[p]artial interest[] in investment real estate." (Ex. 8). Although his statement goes on to indicate that the property owner is Pistakee Partners, LLC, it then states that his equity includes a quarterly cash flow from his interest in the property beginning in 2008.  It does not explain that he is not a member of the Pistakee entity, however, nor that he understood, or so Buralli testified at trial, that his company, Huntley Partners LLC would be paid for the sale of the property upon its sale or refinancing by the Pistakee entity.

these false statements or made them so recklessly as to warrant a finding that he acted with

the requisite deceitful intent. *In re Hudgens*, 149 Fed. Appx. 480 (7th Cir. Aug. 26, 2005); *In re*

*Cohn,* 54 F. 3d 1108 (3d Cir. 1995).

However, Mr. Cameron's proof at trial fails to establish the fourth element for excepting

a claim from discharge under subsection (2)(B). The reliance requirement in Section

523(a)(2)(B) (as well as subsection (A)) includes a causation requirement: the misrepresentation

must be part of the reason that the plaintiff chose to provide money, property, services or an

extension, renewal, or refinancing. As explained by the Seventh Circuit, this causation

requirement comes from the "to the extent obtained by" language in the first clause of Section

523(a)(2) and is also "incorporated in the requirement that the creditor rely on the materially

false statement." *In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *see also*, *In re Sheridan*, 57

F.3d 627 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with

causation in fact.") (quoting *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674-76 (7th Cir. 1995)).

Causation, however, does not require that the ultimate damage or loss suffered by the

plaintiff was caused by the misrepresentation. *McFarland*, 84 F.3d at 947 ("the text of §

523(a)(2)(B) contains no damage or detriment requirement, and the courts are not empowered

to add one."). If it did, this case would be simple, since there were no allegations or evidence

presented that Mr. Buralli's failure to repay his debt or Mr. Cameron's inability to collect the

debt was itself caused by the Huntley property being owned by Pistakee Partners rather than

Huntley Investment. The Huntley property was eventually foreclosed upon and in early 2014,

Pistakee Partners agreed to quit claim the property in lieu of foreclosure to the mortgagee

Standard Bank, with no proceeds to Pistakee. (Trial Tr. 177:3–16, Jan. 30, 2014.)  Therefore,

even if Mr. Buralli had had an ownership interest in Pistakee Partners rather than an indirect
unsecured debt interest there would have been no equity or proceeds to repay Mr. Cameron.

Causation under Section 523(a)(2) instead focuses on whether the misrepresentation at
least partially caused the plaintiff to provide or extend property, services or credit. *See, e.g., In
re Roberts*, 2011 WL 4102540 (Bankr. N.D. Ill. Sept. 14, 2011) ("To satisfy the reliance element
of § 523(a)(2)(A), the creditor must establish that the debtor made a material
misrepresentation that was the cause-in-fact of the debt that the creditor seeks to have
excepted from discharge.").

Mr. Cameron testified that "if that financial statement did not contain that 4-million-
dollar asset consisting of what purports to be a one-third interest in the Huntley land... we
would not have made the loan" or made the subsequent extensions because "it was half of the
value of his net worth and the other items were of smaller values." (Jan. 30, 2014 Tr. 17:3-16,
18:1-6, 33:24 – 34:1-8). But that is not the issue. The issue is whether Mr. Cameron would
have lent or made the extensions if he had known that instead of a direct ownership interest in
the land Mr. Buralli had a right to proceeds of a loan from the owner of the land that was due
upon sale of the land. Although Mr. Cameron questioned the credibility of some of Mr. Buralli's
evidence to support the existence and terms of the debt from Pistakee Partners to Huntley
Investment – noting for example that a copy of the note had not been submitted as an exhibit
and that certain financial documents of Pistakee Partners seemed inconsistent with the
testimony that the note accrued 6% *per annum* interest – the evidence ultimately showed that
the debt and note did exist. Or in any event, the evidence at the very least showed that Mr.
Buralli reasonably believed at the time that he signed the financial statements that he would be

entitled to receive the amount listed in the statements if the property were sold for the value

listed. Therefore, the issue is whether it would have altered Mr. Cameron's lending decision

had he known that, instead of having a 1/3 interest in a limited liability company with total net

equity of about $12 million in real estate, he had a 1/3 interest in a limited liability company

that was owed about $12 million from another limited liability company that owned land with a

total net equity of about $12 million.

　　This information might have been highly important to some lenders, but the evidence

shows that it was not important to Mr. Cameron. For a secured loan an ordinary lender would

want to know that the borrower actually owns property he is purporting to grant a mortgage or

security interest in. But Mr. Cameron was not seeking any mortgage or collateral to secure the

loan. Even where a lender is lending without security, many lenders would like to know what

assets a debtor directly owns – since if the borrower fails to repay the debt the lender may

attempt to execute its judgment on property of the borrower in post-judgment collection

proceedings. But here, Mr. Cameron knew the land was owned by a limited liability company,

and knew that Mr. Buralli had at most a 1/3 membership interest in such company. That means

that even if Huntley Investment had been the owner of the land Mr. Cameron would not have

been able to directly enforce a judgment on the land. Even if he were able to obtain Mr.

Buralli's minority share in the limited liability company it is highly unlikely that he would have

been able to force a sale of the land merely through voting power. If Mr. Cameron was

concerned about being able to directly enforce a judgment on property he knew to be owned

by a limited liability company, one would have expected him to seek a guarantee from the

liability company or similar protection. He did nothing of the sort. Nor did he seem to care if

the limited liability company owed any debts to other creditors that would be senior in priority

to Mr. Buralli's equity interest or that could otherwise decrease his right to share in proceeds

either of a sale of land or repayment of a debt.

The evidence and Mr. Cameron's testimony made clear that when he made the loans he

expected that the Harvard and other projects would be successful and that he would be repaid

out of that success, together with equity gains through the waterpark LLC. It is true that he also

relied on Mr. Buralli's representations that he had other assets, including his investment in the

Huntley property, that could be liquidated as an alternative source of repayment. But, the

evidence showed that Mr. Cameron cared very little about the precise detail or nature of those

assets, so long as Mr. Buralli's net interest was as he indicated. Mr. Cameron apparently made

no investigation at all and asked no questions whatsoever about the other 11 listed investment

properties other than the Huntley property. Even for the Huntley property, it appears that the

only reason he visited the property or asked questions about it was because at the time, in

early 2003, he thought he would be lending and investing in development of the Huntley

property rather than the Harvard project.

Mr. Cameron testified that he "trusted [Mr. Buralli] completely" between 2003 and

2009. (Trial Tr. 48:19–22, Jan. 30, 2014.) He further testified:

 I mean, at the time we trusted him. We believed we were partners with him and
 we were doing a couple of projects with him and dealing with him at least on a
 weekly basis if not three or four times a week trying to do these projects and
 trying to get funded and working on the construction documents, the
 architecture drawings, etc. At that time, we trusted him.

(Trial Tr. 68:2–8, Jan. 30, 2014.) Given the relationship between Mr. Cameron and Mr. Buralli as

demonstrated by the evidence presented, it is evident that it would not have influenced his

decision-making at all if Mr. Buralli had explained in full detail his economic interest in the

Huntley property. Ultimately, Mr. Cameron's actions demonstrate that he only cared that Mr.

Buralli had a right to a distribution of approximately $3.9 million out of the sale of the Huntley

property as was alleged in the financial statements, the fact of which is not contested. But if

the value of the Huntley property and the debt encumbering that property listed in the financial

statements – values that Mr. Cameron does not contend were fraudulent misrepresentations –

were accurate estimates of a sale price and the amount of prior debt that would need to be

satisfied out of sale proceeds before repaying the obligation from Pistakee Partners to Huntley

Investment, then it would have made little difference upon sale of the property whether the

property had been owned by Pistakee Partners or Huntley Investment. It is true that through a

'debt' interest rather than an 'equity' interest Huntley Investment would not get the benefit if

the land were sold for more than enough to pay off the mortgages on the property, the debt to

Huntley Investment and any more senior debt. There is, however, no credible proof that Mr.

Cameron was relying on any such potential 'upside' or that he expected the property to be

listed for sale for more than the amount listed in the financial statement.

Mr. Cameron was no doubt unhappy that the Harvard project and other projects were

ultimately unsuccessful. But he has not alleged, let alone proved, wrongdoing on the part of

Mr. Buralli in that respect. He was also no doubt unhappy that the Huntley property was

apparently unable to be sold, or at least sold for a price high enough for Pistakee Partners to

repay its loan to Huntley Investment. Again, Mr. Cameron does not prove any wrongdoing on

the part of Mr. Buralli in that respect.

To be sure, there were some suggestions and inconsistencies in the financial statements of Pistakee Partners presented as exhibits by Mr. Buralli that cast some doubt on the accuracy of Mr. Buralli's estimates of the value of the Huntley land and the debt encumbering the property or his indirect interest in the property. But these potential inconsistencies were not developed at trial. No evidence was presented on the actual value of the property or balances of debt encumbering that property at the relevant times. Or, even if the Pistakee Partners financial statements were more accurate than Mr. Buralli's estimates, there was no evidence presented that Mr. Buralli knew or should have known that his estimates were incorrect at the time he made them. Instead, the evidence at trial focused entirely on Mr. Buralli's misrepresentation that the Huntley property was owned by his own company rather than by a company owned in part by his wife. As discussed above, the evidence presented did not show this particular misrepresentation to be relevant to Mr. Cameron's decision-making. He appears to have been upset to learn of the true ownership of Pistakee Partners in 2010, but that was well after the development projects had all failed, after the relationship had soured and after Mr. Cameron had initiated a lawsuit against Mr. Buralli to collect his debt.

The evidence showed that at the times Mr. Cameron made and extended the loans, his decision-making would not have been affected by learning the full details of the chain of ownership and interest in the Huntley property. Mr. Cameron therefore failed to demonstrate that he relied on a misrepresentation by Mr. Buralli. As such, judgment must be entered in favor of Mr. Cameron as to his Section 523(a)(2)(B) claim.

### B. **Section 523(a)(4).**

The Plaintiff also asserts a count under Section 523(a)(4), but he made no attempt to support that claim with evidence at trial. Section 523(a)(4) makes non-dischargeable debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Mr. Cameron alleges that Mr. Buralli was a fiduciary because they were "business partners and owners in and of an entity known as 'Waterpark H2OTELS Prairie Stone, LLC.'" Mr. Cameron does not allege embezzlement or larceny. He complains that Mr. Buralli did not repay the personal loans, not that Mr. Buralli misappropriated Mr. Cameron's money that was entrusted to him. As such there is no proof of any embezzlement of the loan proceeds. *See In re Hanson*, 432 B.R. 758, 780 (Bankr. N.D. Ill 2010). The court need not determine whether this relationship created a fiduciary duty on the part of Mr. Buralli towards Mr. Cameron,[4] because Mr. Cameron does not allege let alone prove by a preponderance of the evidence that Mr. Buralli did anything improper in any fiduciary capacity with the proceeds of the personal loans he received from Mr. Cameron, any property of the Waterpark H2OTELS limited liability company or any other property in which Mr. Cameron had an interest. The evidence presented does not establish that Mr. Cameron's personal loans to Mr. Buralli that are at issue here or Mr. Buralli's failure to repay these loans were anything more than a breach of the Debtor's contract duties that does not rise to the level of a breach of a fiduciary duty. *Id.*

---

[4] *See, e.g., In re Jahelka*, 442 B.R. 663, 670 (Bankr. N.D. Ill. 2010) (the term 'fiduciary; in Section 523(a)(4) "is a matter of federal rather than state law" and "a fiduciary relationship under state law in a corporate context does not a 'fiduciary' under 11 U.S.C. § 523(a)(4) make").

## CONCLUSION

For the forgoing reasons, judgment shall be entered in favor of the defendant, Mr.

Buralli, each side to bear his own costs. The foregoing constitutes findings of fact and

conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate

order will be entered consistent with this Memorandum Opinion.


DATE: March 31, 2014           ENTER:

                                       _Thomas M. Lynch_

                                       Thomas M. Lynch
                                       United States Bankruptcy Judge